## UNITED STATES *v.* EATON.

### APPEAL FROM THE COURT OF CLAIMS.

No. 174.  Submitted January 4, 1898. — Decided February 28, 1898.

Congress has power, under the Constitution, to vest in the President authority to appoint a subordinate officer, called a vice-consul, to be temporarily charged with the duty of performing the functions of the consular office.

The Revised Statutes confer upon the President full power, in his discretion, to appoint vice-consuls, and fix their compensation, to be paid out of the allowance made by law for the principal consular officer in whose place such appointment shall be made.

The facts that the minister resident and consul-general at Siam had obtained a leave of absence from the President, and was ill and unable to discharge his duties, and that the vice-consul previously appointed had not qualified, and was absent from Siam, created a temporary vacancy and justified an emergency appointment to fill it.

The accounting officers of the Government did not err in treating the salary fixed by law for the joint service of minister resident and consul-general at Siam as indivisible.

There was no error in allowing Eaton compensation for a period during which he performed the duties of the office before his official bond was received and approved.

A consular officer must account to the Government for fees received by him for administering upon the estates of citizens of the United States, dying within the limits of his jurisdiction.

IN October, 1890, Sempronius H. Boyd was commissioned as minister resident and consul-general of the United States to Siam; he qualified and proceeded to his post, and was in June, 1892, engaged in the discharge of his official duties. At that time, being seriously ill, Boyd was granted by the President a leave of absence. Before leaving Bangkok, Siam, Boyd, to quote from the findings of fact, " believing his illness would terminate fatally, and being desirous to protect the interests of the Government during his absence and until the then expected arrival from the United States of Robert M. Boyd, whom Sempronius Boyd desired should act as consul-general, the latter called to his aid Lewis A. Eaton (now a plaintiff herein, who was then a missionary at Bangkok) and asked him

to take charge of the consulate and its archives. Thereupon the following letter, dated June 21, 1892, was written by Boyd:

> "U. S. Legation and Consulate-General,
>> "Bangkok, June 21, 1892.
>
> "Krom Luang Devawongsee Varoprokan,
>> "Minister for Foreign Affairs:
>
> "Monsieur le Ministre: It is with exceeding regret to me to be forced to abandon my diplomatic and consular duties at the court of His Majesty, with the enjoyment, pleasure, comfort and genuine friendship so marked and distinguished, which the representative of the United States fully appreciated and imparted to his Government.
>
> "All the physicians advise me to go soon to a cold climate. The President has wired me to that effect. In 20 or 30 days I may be strong enough for a sea voyage, of which I will avail myself. I am authorized to designate and do designate L. A. Eaton vice-consul-general until I am able to assume. If not incompatible with public affairs, I beg you to so regard him.
>
> "Monsieur le Ministre, I am too weak and feeble to call in person, which I would so much like to have done, and expressed my thanks and that of my Government to the foreign office and attachés.
>
> "With assurance of my high consideration, I have the honor to be, Monsieur le Ministre, your obedient servant."

Boyd thereupon administered to Eaton an oath to faithfully discharge the duties of the office of vice-consul-general, etc. The findings state that Boyd believed he had authority for this action. Robert M. Boyd, who is referred to above, was then in the United States, and, although appointed as vice-consul, had not qualified. Sempronius H. Boyd remained in Siam until the 12th day of July, 1892, when he left for the United States, and on his departure he turned over to Eaton, as the representative of the Government of the United States, all the archives and property of the legation. Boyd arrived at his home, in the State of Missouri, on August 27, 1892, and although his leave of absence expired October 26, 1892, he did

not, on account of illness, return to his post, but remained at his home, where he died June 22, 1894. Eaton, on the departure of Boyd, was the sole person "in charge of the interests of the Government at Bangkok, and performed whatever duties were required there of either a minister resident or a consul-general, with the knowledge of the Department of State and with that department's approval. The department acknowledged his communications and acted upon them as communications from a person authorized to perform the duties of minister resident and consul-general in the emergency then existing." On "September 2, 1892, Eaton executed (under instructions from the Department of State) an official bond, calling himself acting consul-general of the United States at Bangkok; this was received at the Department of State and was approved January 3, 1893; subsequently, under instructions from the Department of State, dated January 24, 1893, he executed another bond as vice-consul-general of the United States at Bangkok, which was approved by the Secretary of State April 23, 1893. Both of these bonds bore date June 13, 1892, with the knowledge and consent of Eaton's sureties thereon, and were so dated because of a pencil memorandum on each bond when received in blank by Eaton from the Department of State, directing him to insert the date of his appointment in the blank space reserved for the date."

On November 2, 1892, the Secretary of State wrote Eaton, enclosing him the commission of Robert Boyd, which had been issued in 1891, as vice-consul at Siam. In February, 1893, Robert Boyd appeared in Siam, and, in accordance with the instructions of the Secretary of State, Eaton introduced him as vice-consul, and on May 18 he qualified, when Eaton's performance of the duties of the office ceased. The findings below say :

"Eaton rendered to the accounting officers of the Treasury his account for salary for the entire period of his service, in which he charged and claimed one half of the salary of $5000 per annum appropriated for said post of minister resident and consul-general, from July 12, 1892, to October 26, 1892; that is, from the departure of the minister to and including the

date on which the leave of absence for sixty days (excluding transit time) expired, and the full salary at the rate of $5000 per annum from October 27, 1892, to May 17, 1893, inclusive.

"Eaton also rendered with his salary account a return of all fees collected during the entire period of his service, both fees official and unofficial, including fees notarial and fees and fines received in the United States consular court at Bangkok, amounting in all to $245.41.

"Eaton also rendered to the Department of State his account of disbursements from the contingent fund of the legation and consulate-general from July 1, 1892, to April 30, 1893, which was there approved.

"In the settlement of said accounts by the accounting officers of the Treasury the sum of $5.73, expended by Eaton for candles and lanterns, was suspended for information, which was thereafter furnished, but said sum remains disallowed and unpaid.

"In the settlement of Eaton's salary accounts by the Treasury the total amount of fees received, to wit, $245.41, was charged to him and covered into the Treasury. The one half salary from July 12, 1892, to October 26, 1892, amounting to $726.90, was suspended for 'further information,' which was thereafter furnished; but this sum remains unpaid. The full salary from October 27, 1892, to May 17, 1893, amounting to $2792.35, as approved by the Department of State, was allowed and credited. Deducting from this $245 leaves in Eaton's favor a balance of $2546.94, which was certified to his credit by the First Comptroller December 4, 1893, no part of which has been paid."

It is inferable from the facts found that the amount of compensation which the accounting officers of the Government settled and allowed in favor of Eaton, as above stated, was withheld from him because of a claim advanced by Sempronius H. Boyd to the entire salary as minister resident and consul-general during a part of the time for which a portion of or the whole of the salary had been allowed Eaton. Indeed, on the 16th of June, 1894, Sempronius H. Boyd sued in the court below to recover his full salary as minister resident and consul-

general from July, 1892, to February 11, 1893. Thereupon in December, 1894, Eaton commenced his action to recover the sums embraced in the following items:

A. For notarial or unofficial fees charged to him in the settlement of his salary account by report No. 162,708, as aforesaid, as per Exhibit O herewith............................................. $177 41

B. For the item of salary suspended in the settlement of his accounts for salary by report No. 162,708, as aforesaid...................... 726 90

C. For the balance of salary found due to claimant by report No. 162,708, as aforesaid, and certified to his credit......................... 2546 94

D. For item expended for contingent expenses by claimant, and suspended in the settlement of his account therefor by report No. 162,709, as aforesaid................................... 5 73

$3456 98

The court below consolidated the two cases, and on its finding the facts above recited, rejected the claim of Sempronius H. Boyd, his widow having been substituted as a party plaintiff on his death, and allowed the full amount of the claim sued for by Eaton. From this judgment the United States alone appeals.

*Mr. Assistant Attorney General Pradt* and *Mr. Charles W. Russell* for appellants.

*Mr. John C. Chaney* and *Mr. John R. Garrison* for appellee.

Mr. Justice White, after making the foregoing statement of the case, delivered the opinion of the court.

The errors relied upon to obtain a reversal rest on three contentions: 1st. That the appointment of Eaton as acting

vice-consul was without warrant of law, and hence not sus-
ceptible of ratification by the State Department.    2d. Even
if the appointment was authorized by law, the statute confer-
ring the power was in violation of the Constitution of the
United States.    3d. Because, even conceding the appointment
to have been valid, the court allowed a sum in excess of the
amount which the claimant was legally entitled to recover.
We will dispose of these contentions in the order stated.

In the third paragraph of section 1674, Revised Statutes,
the following definition is found: "Vice-consuls and vice-
commercial agents shall be deemed to denote consular officers,
who shall be substituted, temporarily, to fill the places of
consuls-general, consuls or commercial agents, when they shall
be temporarily absent or relieved from duty." And this defi-
nition by Congress of the nature of a vice-consulship was not
changed by the amendment to section 4130 of the Revised
Statutes by the act of February 1, 1876, c. 6, 19 Stat. 2, as the
obvious purpose of that act was simply to provide that where
the words "minister," "consul" or "consul-general" were gen-
erally used, they should be taken also as embracing the sub-
ordinate officers who were to represent the principals in case
of absence. In other words, that where a delegation of au-
thority was made to the incumbent of the office, the fact that
the name of the principal alone was mentioned should not be
considered as excluding the power to exercise such authority
by the subordinate and temporary officer, when the lawful
occasion for the performance of the duty by him arose. Pro-
vision for the appointment and the pay of vice-consuls are
found in the following sections of the Revised Statutes:

"SEC. 1695. The President is authorized to define the extent
of country to be embraced within any consulate or commercial
agency, and to provide for the appointment of vice-consuls,
vice-commercial agents, deputy consuls and consular agents,
therein, in such manner and under such regulations as he shall
deem proper; but no compensation shall be allowed for the
services of any such vice-consul, or vice-commercial agent,
beyond nor except out of the allowance made by law for the
principal consular officer in whose place such appointment

shall be made. No vice-consul, vice-commercial agent, deputy consul or consular agent, shall be appointed otherwise than under such regulations as have been or may be prescribed by the President."

"SEC. 1703. Every vice-consul and vice-commercial agent shall be entitled, as compensation for his services as such, to the whole or so much of the compensation of the principal consular officer in whose place he shall be appointed, as shall be determined by the President, and the residue, if any, shall be paid to such principal consular officer; . . ."

The Consular Regulations, promulgated with the approval of the President, contain the rules adopted in execution of the powers expressed in the above provisions. When the appointment in controversy took place, the regulations of 1888 were in force, and in sections 36, 87 and 471 thereof were found the rules governing the appointments of vice-consuls and temporary vice-consuls and the manner of their payment. These sections are as follows:

"36. Vice-consuls-general, deputy consuls-general, vice-consuls, deputy consuls, vice-commercial agents, deputy commercial agents and consular agents are appointed by the Secretary of State, usually upon the nomination of the principal consular officer, approved by the consul-general (if the nomination relates to a consulate or commercial agency), or if there be no consul-general, then by the diplomatic representative. If there be no consul-general or diplomatic representative, the nomination should be transmitted directly to the Department of State, as should also the nomination for subordinate officers in Mexico, British India, Manitoba and British Columbia. The nomination for vice-consul-general and deputy consul-general must be submitted to the diplomatic representative for approval, if there be one resident in the country. The privilege of making the nomination for the foregoing subordinate officers must not be construed to limit the authority of the Secretary of State, as provided by law, to appoint these officers without such previous nomination by the principal officer. The statutory power in this respect is reserved, and it will be exercised in all cases in which the

interests of the service or other public reasons may be deemed to require it."

"87. In case a vacancy occurs in the offices both of consul and vice-consul, which requires the appointment of a person to perform temporarily the duties of the consulate, the diplomatic representative has authority to make such appointment, with the consent of the foreign government and in conformity to law and these regulations, immediate notice being given to the Department of State. In those countries, however, where there are consuls-general, to whom the nominations of subordinate officers are required to be submitted for approval, the authority to make such temporary appointments is lodged with them. Immediate notice should be given to the diplomatic representative of the proposed appointment, and, if it can be done within a reasonable time, he should be consulted before the appointment is made. If such a vacancy should occur in a consulate general, the temporary appointment will be made by the diplomatic representative."

"471. The compensation of a vice-consul-general, vice-consul, or a vice-commercial agent is provided for only from that of the principal officer. The rules in respect to his compensation are as follows, viz.:

"1. In case the principal officer is absent on leave for sixty days or less, in any one calendar year, and does not visit the United States, the vice-consular officer acting in his place is entitled to one half of the compensation of the office from the date of assuming its duties, unless there is an agreement for a different rate, the principal officer receiving the remainder. But after the expiration of the sixty days, or after the expiration of the principal's leave of absence (if less than sixty days), the vice-consular officer is entitled to the full compensation of the office.

"2. If the principal visits the United States on such leave and returns to his post, the foregoing rule will include the time of transit both from and to his post, as explained in paragraph 460. But if the principal does not return to his post, either because of resignation or otherwise, the rule will embrace only the time of absence, not exceeding sixty days,

together with the time of transit from his post to his residence in the United States."

It is plain that the above sections of the Revised Statutes confer upon the President full power, in his discretion, to appoint vice-consuls and fix their compensation ; that they forbid any appointment, except in accordance with the regulations adopted by the President, with a limitation, however, that the compensation of these officers, if appointed, should be solely " out of the allowance made by law for the principal consular officer in whose place such appointment shall be made." The regulations just quoted come clearly within the power thus delegated. The legality of the appointment in question is then first to be determined by ascertaining whether it was authorized by the regulations. Before analyzing the text of the regulations their general purpose must be borne in mind. The first section referred to, (36,) lodges the power in the Secretary of State in all cases to appoint a vice-consul or vice-consul-general. The manifest object of the provision was to prevent the continued performance of consular duties from being interrupted by any temporary cause, such as absence, sickness or even during an interregnum caused by death and before an incumbent could be appointed. This was secured by the designation in advance of a subordinate and temporary official who, in the event of the happening of the foregoing conditions, would be present to discharge the duties. Section 87 provided for a condition of affairs not embraced in section 36, that is, for the case where there would arise a temporary inability to perform duty on the part of both the consul and vice-consul. The two provisions together secure an unbroken performance of consular duties by creating the necessary machinery to have within reach one qualified to perform them, free from any vicissitude which might befall either the regular incumbent of the office of consul or the vice appointee.

In view of the recognition of Eaton by the State Department and the express approval of his bond as vice-consul, it would result that, at least from the date of the official action of the Secretary of State, he would be entitled to be treated

as appointed by that officer under section 36. But as the sum of the salary allowed by the court below antedated the approval of the bond, we pretermit this question, and come to consider whether Eaton's designation was within the regulation for emergency appointments provided in section 87.

The first requisite for calling the emergency power into play exacted by this regulation was, that there should be a vacancy in the office both of consul-general and vice-consul. It is clear that the findings establish that there was such vacancy within the meaning of the regulation. The fact that the minister resident and consul-general had obtained a leave of absence from the President, and was sick and unable to discharge his duties, and that the vice-consul previously appointed had not qualified, and was absent from Siam, did not, it is argued, justify an emergency appointment, because these facts did not create a vacancy in the narrower sense of that word. But the vacancy to which regulation 87 relates cannot be construed in a technical sense without doing violence to both the letter and spirit of the statute which authorized the regulation, and without destroying the true relation and harmonious operation of the two rules on the subject expressed in sections 36 and 87. That the statute did not contemplate a merely technical vacancy in the office of a consul-general, before a vice-consul could be appointed, clearly results from the fact that it defines the latter and subordinate officer as one " who shall be substituted temporarily to fill the places of consuls-general . . . when they shall be temporarily absent or relieved from duty." The power to make the appointment when the consul-general was only temporarily absent of necessity conveyed authority to do so, although there might be no vacancy in the office but simply an absence of the principal officer. The provision of the statute limiting the pay of the vice-consul or temporary officer out of the pay of the principal official, the incumbent, is also susceptible of but one construction, that is, that the temporary officer could be called upon to discharge the duties, even although there was an incumbent where from absence or other adequate cause he ceased temporarily to perform his duties. Regulation 36, adopted in

pursuance of the statute and providing for the appointment of vice-consuls simultaneously or concurrently with the appointment of consuls, and regulating their pay, is as clear on this subject as is the statute.  As regulation 87 but adds another safeguard to that created by the general terms of 36, by providing for a contingency not contemplated in 36, that is, the case of vacancy in both the consular and vice-consular offices, it follows that the word "vacancy" in 87 imports provision for a condition like unto that contemplated by the law and provided for in 36.  Looking at the two regulations together, and taking in view their purpose, it is obvious that the appointment of the temporary officer for which they both provide depended not solely on a technical vacancy, but included a case where there arose a mere absence or inability of the principal and vice-officer to discharge the duties of the consular office.

Nor is it true to say that because regulation 87 confers the power to appoint an emergency vice-consul-general " on the diplomatic representative," therefore Boyd, who was both minister resident and consul-general, was without authority to make a temporary appointment to the latter office.  The argument by which this proposition is supported is as follows:  As Boyd filled both offices, if there was inability to discharge the duties of the one, there was also like inability as to the other, and therefore incapacity to designate in one character a temporary officer to fill the duties of the other.  The error here lies in assuming that because an official is temporarily prevented from performing the duties of his office thereby he becomes without capacity to make an emergency appointment.  There is no essential identity between the two conditions, and it was because of their evident distinction that the regulations caused the existence of one condition, the temporary failure to perform duty, to give rise to the other; that is, the birth of the power to make the temporary appointment. It would lead to an absurd conclusion to construe the regulation as meaning that the very circumstance which generated the power to make the appointment had the necessary effect of preventing the coming into being of the power created.

If the two offices of minister resident and consul-general be treated as distinct and separate functions, although vested in the same natural person, the authority was clearly in the minister to appoint the vice-consul-general. If, on the other hand, the two functions be considered as indivisible the like result follows, since the mere fact that the officer had obtained a leave or was sick and unable to be present in his office and discharge its duties did not deprive him of the capacity to make a temporary appointment. In its ultimate analysis, the proposition we have just considered substantially maintains that in no case where the duties of the minister resident and consul-general are united in one person can an emergency consul-general be designated under section 87. It would follow that in every such case where leave of absence was granted or sickness arose, and there was no vice-consul-general present, the public interest must inevitably suffer in consequence of the closing of the consular office. But the very purpose of the statute and regulations was to guard against such a contingency. The evil consequences to result from admitting the proposition is conceded, but the result is attributed not to error in the argument, but to a presumed omission in the regulations, which should, it is urged, be corrected, not by judicial construction, but by an amendment or change in the regulations. The error in the proposition, however, cannot be obscured by assigning the consequences which flow from it to a defect in the regulations, when, if a sound rule of interpretation be applied, the supposed omission does not arise.

The construction rendered necessary by a consideration of the text of the statute and the regulations, by the remedy intended to be afforded, and the evil which it was their purpose to frustrate, is that the power to designate in case of the absence or the temporary inability of the consul-general was lodged in a superior officer, if there was such officer in the country where the consul discharged his duty, and, if not, on the happening of the conditions contemplated by the rule the officer highest in rank was authorized to make the temporary appointment. Doubtless it was this construction which caused the Department of State to recognize Eaton's appointment

and the Secretary of State to approve his bond as vice-consul-general. The interpretation given to the regulations by the department charged with their execution, and by the official who has the power, with the sanction of the President, to amend them, is entitled to the greatest weight, and we see no reason in this case to doubt its correctness.

The claim that Congress was without power to vest in the President the appointment of a subordinate officer called a vice-consul, to be charged with the duty of temporarily performing the functions of the consular office, disregards both the letter and spirit of the Constitution. Although article II, section 2, of the Constitution requires consuls to be appointed by the President " by and with the advice and consent of the · Senate," the word " consul" therein does not embrace a subordinate and temporary officer like that of vice-consul as defined in the statute. The appointment of such an officer is within the grant of power expressed in the same section, saying " but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law or in the heads of departments." Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered. The manifest purpose of Congress in classifying and defining the grades of consular offices, in the statute to which we have referred, was to so limit the period of duty to be performed by the vice-consuls and thereby to deprive them of the character of consuls in the broader and more permanent sense of that word. A review of the legislation on the subject makes this quite clear. Section 1674, Revised Statutes, took its source in "An Act to regulate the Diplomatic and Consular Systems of the United States," approved August 18, 1856, c. 127, 11 Stat. 52. Whilst in the earlier periods of the Government, officers known as vice-

consuls were appointed by the President and confirmed by the Senate, the officials thus designated were not subordinate and temporary, but were permanent and in reality principal officials. 7 Opinions Attorneys Gen. 247; 3 Jefferson's Writings, 188. During the period, however, whilst the office of vice-consul was considered as an independent and separate function, requiring confirmation by the Senate, where a vacancy in a consular office arose by death of the incumbent, and the duties were discharged by a person who acted temporarily, without any appointment whatever, it would seem that the practice prevailed of paying such officials as *de facto* officers. In 1832 the Department of State submitted to Mr. Attorney General Taney the question of whether the son of a deceased consul, who had remained in the consular office and discharged its duties, was entitled to the pay of the office. In replying, the Attorney General said:

"If, after the death of Mr. Coxe, his son performed the services, and incurred the expenses of a residence there, and his acts have been recognized by the Government, I do not perceive why he should not receive the compensation fixed by law for such services. He was *de facto* consul for the time and the public received the benefit. . . . The practice of the Government sanctions this opinion, as appears by the papers before me; and in several instances similar to this since the law of 1810, the salary has been paid. . . . The public interest requires that the duties of the office should be discharged by some one; and where, upon the death of the consul, a person who is in possession of the papers of the consulate, enters on the discharge of its duties, and fulfils them to the satisfaction of the Government, I do not perceive why he should not be recognized as consul for the time he acted as such, and performed the services to the public, and if he is so recognized, the law of Congress entitles him to his salary." 2 Opinions Attorneys Gen. 523, 524.

The terms of the law and its construction, in practice for more than forty years, sustain the theory that a vice-consul is a mere subordinate official and we do not doubt its correctness.

We come, then, to consider the errors assigned as to the

amount of the salary. Prior to February 26, 1883, the consular official at Bangkok was of the third class, and his salary was $3000. At the date mentioned, an appropriation was made for minister resident and consul-general to Siam, $5000. 22 Stat. 424, c. 56. It was on this salary, which was reiterated in subsequent appropriations, that the allowance to Eaton was computed by the accounting officer of the Treasury, and adjudged by the court below. It is first claimed that as the vice appointment related only to the consul-general's office and not to that of minister resident, there was error in computing the allowance on the basis of the salary of both offices. Although both the statute and the regulations provide for the payment of the vice official from that of the principal officer, and of this fact Congress presumably had knowledge, yet in no case for the appropriation for the salary of the minister resident and consul-general to Siam has there been an attribution of a portion thereof to one function and another part to the other. On the contrary, Congress has treated the compensation of the two as an indivisible unit. As the duties of the two offices have thus been inseparably blended by Congress, and presumably the performance of the function of one office embraced of necessity the discharge of the duties of the other, we do not think the accounting officers erred in treating the salary fixed for the joint service as indivisible, and in not attempting an apportionment, when Congress had failed to direct that such division be made, or to furnish the method of making it. Indeed, the finding that Eaton executed all the duties of both offices required of him by the State Department, during his temporary tenure, implies that he performed, at the request of the State Department, as consul-general all the functions of minister resident. Thus the facts bring the case directly within Revised Statutes, § 1738, which provides that a consular officer may exercise diplomatic functions in the country to which he is appointed, when there is no officer of the United States empowered to discharge such duties therein, and when the consular officer is "expressly authorized by the President to do so." Conclusive cogency results from these considerations when it is borne in mind that

by the treaty between Siam and the United States there was but one diplomatic and consular officer of the United States in Siam, and that by the express terms of one of the later treaties with Siam the word "consul-general" of the United States therein used is defined to include any consular-officer of the United States in Siam. 23 Stat. 782, 783.

It is further argued that as the vice-consul is required by law (Rev. Stat. § 1698) before he enters on the execution of his trust to give bond, that there was error in allowing Eaton compensation for a period prior to the approval of his bond by the Secretary of State on April 3, 1893. The finding by the court below that Eaton entered on the discharge of his duties when designated, at once communicated with the Department of State, and was recognized as consul-general and allowed to perform all the duties of that office, answers this contention. It is settled that statutory provisions of the character of those referred to are directory and not mandatory. In *United States* v. *Bradley*, 10 Pet. 343, which was a suit upon a bond given by one Hall as paymaster, it was contended that as the bond required by the statute to be executed before an appointee could enter upon the duties of the office had not been furnished, Hall was not accountable as paymaster for moneys received by him from the Government. The court, however, held otherwise, saying, per Story, J. (p. 365): "The giving of the bond was a mere ministerial act for the security of the Government, and not a condition precedent to his authority to act as paymaster. Having received the public moneys as paymaster, he must account for them as paymaster." In *United States* v. *Linn*, 15 Pet. 290, suit was brought upon an undertaking executed by Linn as receiver of public moneys, with sureties. A contention was advanced like that made in the *Bradley case*. The undertaking in question was not executed under seal, while the statute required that the appointee should, before entering upon the duties of the office, execute a "bond." In holding the undertaking enforceable as a common law obligation, and answering the claim that it was not valid for want of a consideration, the court, per Thompson, J., said (p. 313): "The emoluments of the office were the

considerations allowed him for the execution of the duties of his office; and his appointment and commission entitled him to receive this compensation, whether he gave any security or not. His official rights and duties attached upon his appointment." And, in referring approvingly to the decision in the *Bradley case*, and in reiterating the reasoning of the opinion in that case to which we have already alluded, the court said (p. 313): "According to this doctrine, which is undoubtedly sound, Linn was a receiver *de jure* as well as *de facto* when the instrument in question was given. And although the law requiring security was directory to the officers entrusted with taking such security, Linn was under a legal as well as a moral obligation to give the security required by law." At page 314 it was also observed that it was not the mere appointment of Linn as receiver that formed the consideration of the instrument sued upon, but the emoluments and benefits resulting therefrom.

It is true, as claimed by counsel for the Government, that in the opinion delivered in the subsequent case of *United States* v. *LeBaron*, 19 How. 73, expressions are found which appear inconsistent with those to which we have just called attention. But the question presented in the *LeBaron case* was as to the proper construction of the language of a bond which had been given by a Government official, subsequent to his permanent appointment as a deputy postmaster, which bond was executed at the time the appointee was performing the duties of the office under a temporary appointment made during a recess of the Senate. Suit having been brought for a breach of the condition of the bond, it was contended that the terms of the instrument stipulated only for liability for the proper performance of the duties of the office under the first appointment. It was held, however, that as the statute required the giving of bond before the appointee could enter upon the execution of the duties of the office, it could not be presumed that the bond was intended to relate back to an earlier date than the time of its acceptance, and that its terms should be given a prospective and not a retrospective operation. In the course of the reasoning on this branch of the

case general expressions were used to the effect that the appointee could not act and the bond could not take effect until its approval; and in discussing the further contention that the appointee was not in office under the second appointment at the time the bond took effect, because his commission had not been sent to him, and was not actually transmitted until after the death of the President who had made the appointment, it was observed that the acts required by the statute to be performed by the appointee before he could enter on the possession of the office under his appointment were "conditions precedent to the complete investiture of the office;" and that "when the person has performed the required conditions, his title to enter on the possession of the office is also complete." But this general language must be confined to the precise state of facts with reference to which it was used, and does not warrant the inference that it was intended to overrule the doctrine enunciated in the *Bradley* and *Linn cases*, which were not even referred to. Indeed, that this was not supposed to be the deduction proper to be drawn from the reasoning in the *Le Baron case*, is shown by the fact that in the later case of *United States* v. *Flanders*, 112 U. S. 88, the doctrine of the earlier cases was carried to its legitimate result. In the *Flanders case*, the precise question raised in the case at bar was presented and decided. A collector of internal revenue who was required before entering upon the duties of his office to give bond and who was also required to take an oath before becoming entitled to the salary or emoluments of the office, failed to give bond or take the oath until more than two months after he had been allowed to enter upon the duties of the office. In a suit upon the bond, credit was claimed for compensation for services performed during the period preceding the taking of the oath and giving of bond, and the allowance was resisted by the Government on the ground that under the statutory provisions referred to the right to compensation did not exist. The court, however, held otherwise, saying (p. 91):

"If the collector is appointed, and acts and collects the moneys, and pays them over and accounts for them, and the

Government accepts his services and receives the moneys, his title to the compensation necessarily accrues, unless there is a restriction growing out of the fact that another statute says that he must take the oath 'before being entitled to any of the salary or other emoluments' of the office.

"But we are of opinion that the statute is satisfied by holding that his title to receive, or retain, or hold, or appropriate, the commission as compensation, does not arise until he takes and subscribes the oath or affirmation, but that when he does so his compensation is to be computed on moneys collected by him, from the time when, under his appointment, he began to perform services as collector, which the Government accepted, provided he has paid over and accounted for such moneys."

This was evidently the view taken by the State Department, since on January 24, 1893, when the bond was returned for reëxecution in another form, Eaton was directed to insert therein the date of his original appointment. These considerations dispose of all the questions presented, except the contention that there was error in awarding to Eaton certain items of fees collected and reported to the Treasury and charged to him, included in which were commissions of $67.91 earned on the settlement of two estates, and the sum of $5.73 disbursed by Eaton for lights upon the birthday of the King of Siam. We need only examine the legality of the two items just mentioned, as the sole objection made to the validity of the others is that Eaton was not entitled to charge them, because he was not lawfully acting as consul-general.

It is contended that the fees collected for settlement of estates should not be allowed, because the services were "official," and we are referred to paragraph 508, subdivision 69, of the Consular Regulations of 1888, as supporting this claim. On the part of the appellee, however, it is urged that the point has been held otherwise in *United States* v. *Mosby*, 133 U. S. 273, where it is said a similar objection to like charges was decided to be without merit.

It was held in the *Mosby* case that the Court of Claims properly allowed to Mosby — who had been consul at Hong Kong

from February, 1879, to July, 1885 — the sum of $8.21, as "five per cent commission on the estate of Alice Evans, May, 1881." In disposing of the matter the court said (p. 287) that "this evidently was a fee in the settlement of a private estate, and was properly allowed." It does not distinctly appear whether the fee there considered was controlled by the Consular Regulations of 1874 or by those of 1881. This is obvious when it is considered that the regulations of 1881 were only promulgated in May of that year. The regulations controlling this case are those of 1888, which in the respect in question are substantially like those of 1881, whilst fees earned prior to May, 1881, were governed by the regulations of 1874, which differed on the subject from those of 1881. Indeed, this difference between the two was referred to in the *Mosby case*, where it was said (p. 280):

"Paragraph 321 of the Regulations of 1874 is as follows: '321. All acts are to be regarded as "official services" when the consul is required to. use his seal and title officially, or either of them; and the fees received therefor are to be accounted for to the Treasury of the United States.' It is to be observed that this paragraph used the word 'required,' and does not say that all acts are to be regarded as official services when the consul uses his seal and title officially, or either of them."

\*         \*         \*         \*         \*

"Paragraph 489 of the Regulations of 1881 reads as follows: '489. All acts or services for which a fee is prescribed in the tariff of fees are to be regarded as official services, and the fees received therefor are to be reported and accounted for to the Treasury of the United States,' except when otherwise expressly stated therein."

In view of the fact that it is not certain when the fees in question in the *Mosby case* were earned and of the difference between the Consular Regulations of 1874 and 1881, we shall not inquire into the correctness of the decision in the *Mosby case* as applied to the precise facts there considered, but will examine the question here presented in the light of the Consular Regulations of 1888 and as one of first impression.

By section 1745 of the Revised Statutes, the President is authorized to prescribe, from time to time, the rates or tariffs of fees to be charged by diplomatic and consular officers for official services, "and to designate what shall be regarded as official services, besides such as are expressly declared by law." Section 1709 of the Revised Statutes makes it the "duty" of consuls and vice-consuls to administer upon the personal estate left by any citizen of the United States who shall die within their consulate.

The fact that the statute makes it the duty of a consul to administer on personal estates gives rise to the clearest implication that fees for such services were official fees, and the regulations on the subject promulgated by the President clearly support this view. Thus, in the tariff of consular fees contained in paragraph 508 of the Consular Regulations of 1888 it is provided, in item numbered 56, as follows:

"56. For taking into possession the personal estate of any citizen who shall die within the limits of a consulate, inventorying, selling and finally settling and preparing or transmitting, according to law, the balance due thereon, five per cent on the gross amount of such estate. If part of such estate shall be delivered over before final settlement, two and one half per cent to be charged on the part so delivered over as is not in money, and five per cent on the gross amount of the residue. If among the effects of the deceased are found certificates of foreign stocks, loans or other property, two and one half per cent on the amount thereof. No charge will be made for placing the official seal upon the personal property or effects of such deceased citizen, or for breaking or removing the seals."

And, by paragraph 375 of the same regulations, a consular officer is directed to report to the Treasury Department fees of this character, and if he be a salaried officer to hold the same subject to the order of the department. This decisive provision is besides supplemented by paragraph 501 of the regulations, in which it is declared that "all acts or services for which a fee is prescribed in the tariff of fees are to be regarded as *official* services, and the fees charged and received

therefor are to be reported and accounted for to the Treasury of the United States, except when otherwise expressly stated therein."

As the statute made it the official duty of a consul to administer upon the estates of American citizens dying within the consular district, and the President, by virtue of the power vested in him, has clearly placed such duties in the category of "official services," and required the fees earned therefor to be accounted for as "official fees," it is plain that the accounting officer of the Treasury properly charged Eaton with the amount of such fees, and that the Court of Claims erred in its ruling to the contrary.

The ground of objection urged to the allowance by the Court of Claims of the item of $5.73 is stated in the brief to be that the disbursement "was personal or diplomatic and wholly foreign to consular business." We are unable, however, to say that the Court of Claims erred in its finding in respect to this item, as follows: "The petty item for lights upon the King's birthday was approved by the Department of State, and appears to be a charge within the discretion of that department; it is therefore allowed."

It follows from the foregoing considerations that the only error committed by the court below was in treating the fees for the settlement of estates as unofficial, when they should have been held to be official. But this does not render it necessary to reverse the judgment in its entirety, but only to modify the same. Rev. Stat. sec. 707; *Ballew* v. *United States*, 160 U. S. 187. This modification will be effected by deducting from the principal sum of $3456.98, found due by the Court of Claims, $67.91, being the amount of the fees improperly allowed. The judgment of the Court of Claims is therefore modified by reducing the amount thereof to $3389.07, and as so modified it is

*Affirmed.*