(Slip Opinion) OCTOBER TERM, 2016 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL LABOR RELATIONS BOARD *v.* SW GENERAL, INC., DBA SOUTHWEST AMBULANCE

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 15–1251. Argued November 7, 2016—Decided March 21, 2017

Article II of the Constitution requires that the President obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." §2, cl. 2. Given this provision, the responsibilities of an office requiring Presidential appointment and Senate confirmation (PAS office) may go unperformed if a vacancy arises and the President and Senate cannot promptly agree on a replacement. Congress has accounted for this reality by giving the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval.

The current version of that authorization is the Federal Vacancies Reform Act of 1998 (FVRA). Section 3345(a) of the FVRA permits three categories of Government officials to perform acting service in a vacant PAS office. Subsection (a)(1) prescribes the general rule that, if a vacancy arises in a PAS office, the first assistant to that office "shall perform" the office's "functions and duties temporarily in an acting capacity." Subsections (a)(2) and (a)(3) provide that, "notwithstanding paragraph (1)," the President "may direct" a person already serving in another PAS office, or a senior employee in the relevant agency, to serve in an acting capacity instead.

Section 3345 also makes certain individuals ineligible for acting service. Subsection (b)(1) states: "Notwithstanding subsection (a)(1), a person may not serve as an acting officer for an office under this section" if the President nominates him for the vacant PAS office and, during the 365-day period preceding the vacancy, the person "did not serve in the position of first assistant" to that office or "served in [that] position . . . for less than 90 days."

The general counsel of the National Labor Relations Board (NLRB

or the Board) is a PAS office. In June 2010, a vacancy arose in that office, and the President directed Lafe Solomon to serve as acting general counsel. Solomon qualified for acting service under subsection (a)(3) of the FVRA, because he was a senior employee at the NLRB. In January 2011, the President nominated Solomon to serve as the NLRB's general counsel on a permanent basis. The Senate never took action on the nomination, and the President ultimately withdrew Solomon's name in favor of a new candidate, whom the Senate confirmed in October 2013. Throughout this entire period Solomon served as the acting general counsel to the NLRB.

In January 2013, an NLRB Regional Director, exercising authority on Solomon's behalf, issued an unfair labor practices complaint against respondent SW General, Inc. An Administrative Law Judge concluded that SW General had committed unfair labor practices, and the NLRB agreed. SW General sought review in the United States Court of Appeals for the District of Columbia Circuit, arguing that the complaint was invalid because, under subsection (b)(1) of the FVRA, Solomon could not perform the duties of general counsel to the NLRB after having been nominated to fill that position. The NLRB countered that subsection (b)(1) applies only to first assistants who automatically assume acting duties under subsection (a)(1), not to acting officers who, like Solomon, serve under (a)(2) or (a)(3). The Court of Appeals vacated the Board's order. It concluded that the prohibition on acting service by nominees contained in subsection (b)(1) applies to all acting officers, regardless of whether they serve pursuant to subsection (a)(1), (a)(2), or (a)(3). As a result, Solomon became ineligible to perform the duties of general counsel in an acting capacity once the President nominated him to fill that post.

*Held*:

1. Subsection (b)(1) of the FVRA prevents a person who has been nominated to fill a vacant PAS office from performing the duties of that office in an acting capacity. The prohibition applies to anyone performing acting service under the FVRA. It is not limited to first assistants performing acting service under subsection (a)(1). Pp. 8–18.

(a) The text of the FVRA requires this conclusion. Pp. 8–14.

(1) Subsection (b)(1) applies to any "person" and prohibits service "as an acting officer for an office under this section." "Person" has an expansive meaning that can encompass anyone who performs acting duties under the FVRA. See *Pfizer Inc.* v. *Government of India*, 434 U. S. 308, 312. And "under this section" clarifies that subsection (b)(1) applies to all of §3345: The FVRA contains cross-references to specific subsections and paragraphs. But subsection (b)(1) refers to §3345, which contains all of the ways a person may be-

come an acting officer. The rest of the FVRA also uses the pairing of "person" and "section" to encompass anyone serving as an acting officer under the FVRA, and Congress could readily have used more specific language if it intended subsection (b)(1) to apply only to first assistants acting under (a)(1).

The dependent clause at the beginning of subsection (b)(1)— "[n]otwithstanding subsection (a)(1)"—confirms the breadth of the prohibition on acting service by nominees. In statutes, "notwithstanding" clauses show that one provision prevails over another in the event of a conflict. Here, that means that subsection (b)(1) applies even when it conflicts with the default rule in (a)(1) that first assistants "shall perform" acting duties. Pp. 8–10.

(2) The Board argues that, because the phrase "notwithstanding subsection (a)(1)" does not mention (a)(2) or (a)(3), Congress did not intend the prohibition in subsection (b)(1) to apply to people serving as acting officers under those provisions. The Board relies on the "interpretive canon, *expressio unius est exclusio alterius*, expressing one item of [an] associated group or series excludes another left unmentioned." *Chevron U. S. A. Inc.* v. *Echazabal*, 536 U. S. 73, 80 (internal quotation marks omitted).

This interpretive canon applies, however, only when "circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded." *Id.,* at 81. A "notwithstanding" clause does not naturally give rise to such an inference; it just shows which of two or more provisions prevails in the event of a conflict. Singling out one conflict generally does not suggest that other, unaddressed conflicts should be resolved in the opposite manner. Here, the conflict between (a)(1) and (b)(1) is unique: The former uses mandatory language—the first assistant "shall perform" acting duties—while the latter identifies who "may not" serve as an acting officer. The "notwithstanding" clause clarifies that the mandatory language in subsection (a)(1) does not prevail over subsection (b)(1) in the event of a conflict. Subsections (a)(2) and (a)(3) lack that mandatory language, so the natural inference is that Congress left these provisions out of the "notwithstanding" clause because they differ from subsection (a)(1), not to implicitly exempt them from the prohibition in subsection (b)(1).

Moreover, subsection (b)(2) specifies that (b)(1) "shall not apply" to certain people who are "serving as the first assistant." If (b)(1) applied only to first assistants, stating that limitation would be superfluous. Pp. 10–14.

(b) Because the text is clear, the Board's arguments about legislative history, purpose, and post-enactment practice need not be considered. In any event, its arguments are not compelling.

Syllabus

The original draft of the FVRA contained a prohibition on nominees serving as acting officers, but explicitly limited that prohibition to first assistants. The Board argues that, when Congress revised this original draft, it made changes to give the President more flexibility to appoint acting officers and did not intend to broaden the prohibition on nominees performing acting service. The glitch in this argument is that Congress did change the prohibition on nominees performing acting service, revising it to clearly apply to all acting officers. The fact that certain Senators stated that they wanted to give the President more flexibility to appoint acting officials does not mean that they got exactly what they wanted. Nor does a statement by one of the sponsors of the FVRA—who said that subsection (b)(1) applies only to first assistants—overcome the clear text, particularly given that the very next Senator to speak offered a contradictory account of the provision.

The Board also argues that, since the FVRA was enacted, Congress has not objected when Presidents have nominated individuals who were serving as acting officers under subsection (a)(2) or (a)(3), and that the Office of Legal Counsel and Government Accountability Office have issued guidance construing subsection (b)(1) to apply only to first assistants. Relying on *NLRB* v. *Noel Canning*, the Board contends that this "historical practice" is entitled to "significant weight." 573 U. S. ___.

"[H]istorical practice" is too grand a title for the Board's evidence. The FVRA was not enacted until 1998, and the evidence the Board cites is not significant enough to warrant the conclusion that Congress's failure to speak up implies that it has acquiesced in the view that subsection (b)(1) applies only to first assistants. By contrast, the Court's decision in *Noel Canning* dealt with the President's constitutional authority under the Recess Appointments Clause; an issue that had attracted intense attention from Presidents, Attorneys General, and the Senate dating back to the beginning of the Republic. Pp. 14–18.

2. Applying the FVRA to this case is straightforward. Subsection (b)(1) prohibited Solomon from continuing his service as acting general counsel once the President nominated him to fill the position permanently. The President could have appointed another person to serve as acting officer in Solomon's place, but did not do so. P. 18.

796 F. 3d 67, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY, THOMAS, BREYER, ALITO, and KAGAN, JJ., joined. THOMAS, J., filed a concurring opinion. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–1251

## NATIONAL LABOR RELATIONS BOARD, PETITIONER *v.* SW GENERAL, INC., DBA SOUTHWEST AMBULANCE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 21, 2017]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Article II of the Constitution requires that the President obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." §2, cl. 2. Given this provision, the responsibilities of an office requiring Presidential appointment and Senate confirmation— known as a "PAS" office—may go unperformed if a vacancy arises and the President and Senate cannot promptly agree on a replacement. Congress has long accounted for this reality by authorizing the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation.

The Federal Vacancies Reform Act of 1998 (FVRA), 5 U. S. C. §3345 *et seq.*, is the latest version of that authorization. Section 3345(a) of the FVRA authorizes three classes of Government officials to become acting officers. The general rule is that the first assistant to a vacant office shall become the acting officer. The President may

override that default rule by directing either a person serving in a different PAS office or a senior employee within the relevant agency to become the acting officer instead.

The FVRA, however, prohibits certain persons from serving as acting officers if the President has nominated them to fill the vacant office permanently. The question presented is whether that limitation applies only to first assistants who have automatically assumed acting duties, or whether it also applies to PAS officers and senior employees serving as acting officers at the President's behest. We hold that it applies to all three categories of acting officers.

## I

### A

The Senate's advice and consent power is a critical "structural safeguard[ ] of the constitutional scheme." *Edmond* v. *United States*, 520 U. S. 651, 659 (1997). The Framers envisioned it as "an excellent check upon a spirit of favoritism in the President" and a guard against "the appointment of unfit characters . . . from family connection, from personal attachment, or from a view to popularity." The Federalist No. 76, p. 457 (C. Rossiter ed. 1961) (A. Hamilton). The constitutional process of Presidential appointment and Senate confirmation, however, can take time: The President may not promptly settle on a nominee to fill an office; the Senate may be unable, or unwilling, to speedily confirm the nominee once submitted. Yet neither may desire to see the duties of the vacant office go unperformed in the interim.

Since President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval. The earliest statutes authorized the appointment of "any

person or persons" to fill specific vacancies in the Departments of State, Treasury, and War. Act of May 8, 1792, ch. 37, §8, 1 Stat. 281. Congress at first allowed acting officers to serve until the permanent officeholder could resume his duties or a successor was appointed, *ibid.*, but soon imposed a six-month limit on acting service, Act of Feb. 13, 1795, ch. 21, 1 Stat. 415.

Congress revisited the issue in the 1860s, ultimately passing the Vacancies Act of 1868. The Vacancies Act expanded the number of PAS offices that the President could fill with acting officers. Act of July 23, 1868, ch. 227, 15 Stat. 168; see also Act of Feb. 20, 1863, ch. 45, 12 Stat. 656. With that expansion came new constraints. The authority to appoint "any person or persons" as an acting officer gave way to a default rule that the "first or sole assistant . . . shall" perform that function, with an exception allowing the President to instead fill the post with a person already serving in a PAS office. 15 Stat. 168. And rather than six months of acting service, the Vacancies Act generally authorized only ten days. *Ibid.* That narrow window of acting service was later lengthened to 30 days. Act of Feb. 6, 1891, ch. 113, 26 Stat. 733.

During the 1970s and 1980s, interbranch conflict arose over the Vacancies Act. The Department of Justice took the position that, in many instances, the head of an executive agency had independent authority apart from the Vacancies Act to temporarily fill vacant offices. The Comptroller General disagreed, arguing that the Act was the exclusive authority for temporarily filling vacancies in executive agencies. See M. Rosenberg, Congressional Research Service Report for Congress, The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative 2–4 (1998) (Rosenberg). Congress then amended the Vacancies Act to clarify that it applies to such agencies, while at the same time lengthening the term of permissible acting service to 120 days, with a

tolling period while a nomination is pending. *Id.,* at 3; see Presidential Transitions Effectiveness Act, §7, 102 Stat. 988.

But tensions did not ease. By 1998, approximately 20 percent of PAS offices in executive agencies were occupied by "temporary designees, most of whom had served beyond the 120-day limitation period . . . without presidential submissions of nominations." Rosenberg 1. These acting officers filled high-level positions, sometimes in obvious contravention of the Senate's wishes. One, for instance, was brought in from outside Government to serve as Acting Assistant Attorney General for the Civil Rights Division of the Justice Department, immediately after the Senate refused to confirm him for that very office. *Ibid.*; see M. Rosenberg, Congressional Research Service, Validity of Designation of Bill Lann Lee as Acting Assistant Attorney General for Civil Rights 1–3 (1998). Perceiving a threat to the Senate's advice and consent power, see Rosenberg 6, Congress acted again. In 1998, it replaced the Vacancies Act with the FVRA.

Section 3345(a) of the FVRA permits three categories of Government officials to perform acting service in a vacant PAS office. Subsection (a)(1) prescribes a general rule: If a person serving in a PAS office dies, resigns, or is otherwise unable to perform his duties, the first assistant to that office "shall perform" the office's "functions and duties . . . temporarily in an acting capacity."

The next two paragraphs of §3345(a) identify alternatives. Subsection (a)(2) provides that "notwithstanding paragraph (1)," the President "may direct a person" who already serves in a PAS office to "perform the functions and duties of the vacant office temporarily in an acting capacity." Subsection (a)(3) adds that "notwithstanding paragraph (1)," the President "may direct" a person to perform acting duties if the person served in a senior position in the relevant agency for at least 90 days in the

365-day period preceding the vacancy.[1]

Section 3345 also makes certain individuals ineligible for acting service. Subsection (b)(1) states: "Notwithstanding subsection (a)(1), a person may not serve as an acting officer for an office under this section" if the President nominates him for the vacant PAS office and, during the 365-day period preceding the vacancy, the individual "did not serve in the position of first assistant" to that office or "served in [that] position . . . for less than 90 days." Subsection (b)(2) creates an exception to this prohibition, providing that "[p]aragraph (1) shall not apply to any person" serving in a first assistant position that itself requires the Senate's advice and consent.

Other sections of the FVRA establish time limits on acting service and penalties for noncompliance. In most cases, the statute permits acting service for "210 days beginning on the date the vacancy occurs"; tolls that time limit while a nomination is pending; and starts a new 210-day clock if the nomination is "rejected, withdrawn, or returned." §§3346(a)–(b)(1). Upon a second nomination, the time limit tolls once more, and an acting officer can serve an additional 210 days if the second nomination proves unsuccessful. §3346(b)(2). The FVRA ensures compliance by providing that, in general, "any function or duty of a vacant office" performed by a person not properly serving under the statute "shall have no force or effect." §3348(d).

B

The National Labor Relations Board (NLRB or Board) is charged with administering the National Labor Relations Act. By statute, its general counsel must be appointed by the President with the advice and consent of the Senate.

---

[1] A senior position is one that has a rate of pay equal to or greater than the minimum rate "for a position at GS–15 of the General Schedule." 5 U. S. C. §3345(a)(3)(B).

29 U. S. C. §153(d).

In June 2010, the NLRB's general counsel—who had been serving with Senate confirmation—resigned. The President directed Lafe Solomon to serve temporarily as the NLRB's acting general counsel, citing the FVRA as the basis for the appointment. See Memorandum from President Barack Obama to L. Solomon (June 18, 2010). Solomon satisfied the requirements for acting service under subsection (a)(3) of the FVRA because he had spent the previous ten years in the senior position of Director of the NLRB's Office of Representation Appeals.

The President had bigger plans for Solomon than acting service. On January 5, 2011, he nominated Solomon to serve as the NLRB's general counsel on a permanent basis. The Senate had other ideas. That body did not act upon the nomination during the 112th Congress, so it was returned to the President when the legislative session expired. 159 Cong. Rec. S17 (Jan. 3, 2013). The President resubmitted Solomon's name for consideration in the spring of 2013, *id.,* at S3884 (May 23, 2013), but to no avail. The President ultimately withdrew Solomon's nomination and put forward a new candidate, whom the Senate confirmed on October 29, 2013. *Id.,* at S7635. Throughout this entire period, Solomon served as the NLRB's acting general counsel.

Solomon's responsibilities included exercising "final authority" to issue complaints alleging unfair labor practices. 29 U. S. C. §§153(d), 160(b). In January 2013, an NLRB Regional Director, exercising authority on Solomon's behalf, issued a complaint alleging that respondent SW General, Inc.—a company that provides ambulance services—had improperly failed to pay certain bonuses to long-term employees. An Administrative Law Judge concluded that SW General had committed unfair labor practices, and the NLRB agreed. 360 N. L. R. B. 109 (2014).

SW General filed a petition for review in the United States Court of Appeals for the District of Columbia Circuit. It argued that the unfair labor practices complaint was invalid because, under subsection (b)(1) of the FVRA, Solomon could not legally perform the duties of general counsel after having been nominated to fill that position. The NLRB defended Solomon's actions. It contended that subsection (b)(1) applies only to first assistants who automatically assume acting duties under subsection (a)(1), not to acting officers who, like Solomon, serve under (a)(2) or (a)(3).

The Court of Appeals granted SW General's petition for review and vacated the Board's order. It reasoned that "the text of subsection (b)(1) squarely supports" the conclusion that the provision's restriction on nominees serving as acting officers "applies to all acting officers, no matter whether they serve pursuant to subsection (a)(1), (a)(2) or (a)(3)." 796 F. 3d 67, 78 (CADC 2015). As a result, Solomon became "ineligible to serve as Acting General Counsel once the President nominated him to be General Counsel." *Id.,* at 72.[2] We granted certiorari, 579 U. S. ___ (2016), and now affirm.

———————

[2] The FVRA exempts "the General Counsel of the National Labor Relations Board" from the general rule that actions taken in violation of the FVRA are void *ab initio.* 5 U. S. C. §3348(e)(1). The Court of Appeals "assume[d] that section 3348(e)(1) renders the actions of an improperly serving Acting General Counsel *voidable*" and rejected the Board's argument against voiding Solomon's actions. 796 F. 3d, at 79–82. The Board did not seek certiorari on this issue, so we do not consider it.

In addition, the unfair labor practice complaint in this case was issued after the Senate had returned Solomon's nomination the first time but before the President had renominated him to the same position. In the proceedings below, the Board did not argue that this timing made any difference, and the court assumed it had no bearing on the proper application of the FVRA to this case. *Id.,* at 72, n. 3. We proceed on the same assumption.

## II

Subsection (b)(1) of the FVRA prevents a person who has been nominated for a vacant PAS office from performing the duties of that office in an acting capacity. In full, it states:

> "(1) Notwithstanding subsection (a)(1), a person may not serve as an acting officer for an office under this section, if—
>
> (A) during the 365-day period preceding the date of the death, resignation, or beginning of inability to serve, such person—
>
> (i) did not serve in the position of first assistant to the office of such officer; or
>
> (ii) served in the position of first assistant to the office of such officer for less than 90 days; and
>
> (B) the President submits a nomination of such person to the Senate for appointment to such office."

Subsection (b)(2) adds that "[p]aragraph (1) shall not apply" to a person serving in a first assistant position that itself requires the advice and consent of the Senate.

We conclude that the prohibition in subsection (b)(1) applies to anyone performing acting service under the FVRA. It is not, as the Board contends, limited to first assistants performing acting service under subsection (a)(1). The text of the prohibition extends to any "person" who serves "as an acting officer . . . under this section," not just to "first assistants" serving under subsection (a)(1). The phrase "[n]otwithstanding subsection (a)(1)" does not limit the reach of (b)(1), but instead clarifies that the prohibition applies even when it conflicts with the default rule that first assistants shall perform acting duties.

### A

#### 1

Our analysis of subsection (b)(1) begins with its text.

Subsection (b)(1) applies to any "person" and prohibits service "as an acting officer for an office under this section." The key words are "person" and "section." They clearly indicate that (b)(1) applies to all acting officers under §3345, regardless of the means of appointment.

Start with "person." The word has a naturally expansive meaning that can encompass anyone who performs acting duties under the FVRA. See *Pfizer Inc.* v. *Government of India*, 434 U. S. 308, 312 (1978). Important as they may be, first assistants are not the only "person[s]" of the bunch.

Now add "under this section." The language clarifies that subsection (b)(1) applies to all persons serving under §3345. Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line. See *Koons Buick Pontiac GMC, Inc.* v. *Nigh*, 543 U. S. 50, 60–61 (2004); L. Filson, The Legislative Drafter's Desk Reference 222 (1992). Congress used that structure in the FVRA and relied on it to make precise cross-references. When Congress wanted to refer only to a particular subsection or paragraph, it said so. See, *e.g.,* §3346(a)(2) ("subsection (b)"); §3346(b)(2) ("paragraph (1)"). But in (b)(1) Congress referred to the entire section—§3345—which subsumes all of the ways a person may become an acting officer.

The rest of the FVRA uses the pairing of "person" and "section" the same way. Section 3346, for example, specifies how long "the *person* serving as an acting officer as described under *section* 3345 may serve in the office." (Emphasis added.) And §3348(d)(1) describes the consequences of noncompliance with the FVRA by referring to the actions "taken by any *person* who is not acting under *section* 3345, 3346, or 3347." (Emphasis added.) No one disputes that both provisions apply to anyone serving as an acting officer under the FVRA, not just first assistants serving under subsection (a)(1).

Had Congress intended subsection (b)(1) to apply only to first assistants acting under (a)(1), it could easily have chosen clearer language. Replacing "person" with "first assistant" would have done the trick. So too would replacing "under this section" with "under subsection (a)(1)." "The fact that [Congress] did not adopt [either] readily available and apparent alternative strongly supports" the conclusion that subsection (b)(1) applies to any acting officer appointed under any provision within §3345. *Knight* v. *Commissioner*, 552 U. S. 181, 188 (2008).

The dependent clause at the beginning of subsection (b)(1)—"[n]otwithstanding subsection (a)(1)"—confirms that the prohibition on acting service applies even when it conflicts with the default rule that the first assistant shall perform acting duties. The ordinary meaning of "notwithstanding" is "in spite of," or "without prevention or obstruction from or by." Webster's Third New International Dictionary 1545 (1986); Black's Law Dictionary 1091 (7th ed. 1999) ("Despite; in spite of"). In statutes, the word "shows which provision prevails in the event of a clash." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126–127 (2012). Subsection (a)(1) sets the rule that first assistants "shall perform" the vacant office's "functions and duties . . . in an acting capacity." But the "notwithstanding" clause in subsection (b)(1) means that, even if a first assistant is serving as an acting officer under this statutory mandate, he must cease that service if the President nominates him to fill the vacant PAS office. That subsection (b)(1) also applies to acting officers serving at the President's behest is already clear from the broad text of the independent clause—they are all "person[s]" serving "under this section."

2

The Board takes a different view of the phrase "[n]otwithstanding subsection (a)(1)." It begins by noting

that §3345(a) uses three different subsections to "create three separate paths for becoming an acting official." Reply Brief 2. The prohibition in subsection (b)(1), the Board continues, "applies '[n]otwithstanding' only *one* of these subsections—'subsection (a)(1).'" *Ibid.* In the Board's view, singling out subsection (a)(1) carries a negative implication: that "Congress did not intend Subsection (b)(1) to override the alternative mechanisms for acting service in Subsections (a)(2) and (a)(3)." *Id.,* at 3.

We disagree. The Board relies on the "interpretive canon, *expressio unius est exclusio alterius*, 'expressing one item of [an] associated group or series excludes another left unmentioned.'" *Chevron U. S. A. Inc.* v. *Echazabal*, 536 U. S. 73, 80 (2002) (quoting *United States* v. *Vonn*, 535 U. S. 55, 65 (2002)). If a sign at the entrance to a zoo says "come see the elephant, lion, hippo, and giraffe," and a temporary sign is added saying "the giraffe is sick," you would reasonably assume that the others are in good health.

"The force of any negative implication, however, depends on context." *Marx* v. *General Revenue Corp.*, 568 U. S. ___, ___ (2013) (slip op., at 9). The *expressio unius* canon applies only when "circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded." *Echazabal*, 536 U. S., at 81. A "notwithstanding" clause does not naturally give rise to such an inference; it just shows which of two or more provisions prevails in the event of a conflict. Such a clause confirms rather than constrains breadth. Singling out one potential conflict might suggest that Congress thought the conflict was particularly difficult to resolve, or was quite likely to arise. But doing so generally does not imply anything about other, unaddressed conflicts, much less that they should be resolved in the *opposite* manner.

Suppose a radio station announces: "We play your favorite hits from the '60s, '70s, and '80s. Notwithstanding the

fact that we play hits from the '60s, we do not play music by British bands." You would not tune in expecting to hear the 1970s British band "The Clash" any more than the 1960s "Beatles." The station, after all, has announced that "we do not play music by British bands." The "notwithstanding" clause just establishes that this applies even to music from the '60s, when British bands were prominently featured on the charts. No one, however, would think the station singled out the '60s to convey implicitly that its categorical statement "we do not play music by British bands" actually did not apply to the '70s and '80s.

Drawing a negative inference from the "notwithstanding" clause in subsection (b)(1) is similarly inapt. Without that clause, subsection (b)(1) plainly would apply to all persons serving as acting officers under §3345(a). Adding "notwithstanding subsection (a)(1)" makes sense because (a)(1) conflicts with (b)(1) in a unique manner. The former is mandatory and self-executing: The first assistant "*shall* perform" acting duties. The latter, by contrast, speaks to who "may not" be an acting officer. So if a vacancy arises and the President nominates the first assistant to fill the position, (a)(1) says the first assistant "shall perform" the duties of that office in an acting capacity while the nomination is pending, and (b)(1) says he "may not." The "notwithstanding" clause clarifies that the language of (a)(1) does not prevail if that conflict occurs.

Compare the mandatory language of subsection (a)(1) to (a)(2) and (a)(3). People appointed under those provisions are just as much acting officers as first assistants who assume the role. But there is no freestanding directive that they perform acting duties; subsections (a)(2) and (a)(3) just say that the President "may direct" them to do so. The natural inference, then, is that Congress left these provisions out of the "notwithstanding" clause because they are different from subsection (a)(1), not to exempt

from the broad prohibition in subsection (b)(1) those offic-
ers serving under (a)(2) and (a)(3).

Indeed, "notwithstanding" is used the same way in other
parts of §3345. Subsections (a)(2) and (a)(3) are each
preceded by the phrase "notwithstanding paragraph (1)."
The phrase recognizes that subsection (a)(1) is unique, and
resolves the potential conflict between the mandatory
"shall perform" in that provision and the permissive "may
direct" in (a)(2) and (a)(3). But it implies nothing about
other potential conflicts that may arise in the statutory
scheme. In subsection (b)(1), it works the same way: The
"notwithstanding" clause simply shows that (b)(1) over-
rides (a)(1), and nothing more.

Step back from the Board's focus on "notwithstanding"
and another problem appears: Its interpretation of subsec-
tion (b)(1) makes a mess of (b)(2). Subsection (b)(2) speci-
fies that (b)(1) "shall not apply to any person" if (A) that
person "is serving as the first assistant"; (B) the first
assistant position is itself a PAS office; and (C) "the Senate
has approved the appointment of such person" to that
office.

The Board's interpretation makes the first requirement
superfluous, a result we typically try to avoid. *Williams* v.
*Taylor*, 529 U. S. 362, 404 (2000) ("It is . . . a cardinal
principle of statutory construction that we must give
effect, if possible, to every clause and word of a statute."
(internal quotation marks omitted)). If subsection (b)(1)
applied only to first assistants, there would be no need to
state the requirement in (b)(2)(A) that "such person is
serving as the first assistant." The Board proposes that
Congress did so for clarity, but the same could be said of
most superfluous language.

The Board and the dissent counter that applying the
prohibition in subsection (b)(1) to anyone performing
acting service under §3345(a) has its own problem: Doing
so would also require applying it to §3345(c)(1), which

"would nullify" that provision. Reply Brief 9. The dissent deems this "no way to read a statute." *Post*, at 6.

We agree, and it is not the way we read it. Under our reading, subsection (b)(1) has no effect on (c)(1). Subsection (b)(1) addresses nominations *generally*, prohibiting any person who has been nominated to fill any vacant office from performing that office's duties in an acting capacity. Subsection (c)(1) speaks to a *specific* nomination scenario: When a person is "nominated by the President for reappointment for an additional term to the same office . . . without a break in service." In this particular situation, the FVRA authorizes the nominee "to continue to serve in that office." §3345(c). "[I]t is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S. 639, 645 (2012). The general prohibition on acting service by nominees yields to the more specific authorization allowing officers up for reappointment to remain at their posts. Applying subsection (b)(1) to §3345(a) hardly compels a different result.

The text of subsection (b)(1) is clear: Subject to one narrow exception, it prohibits anyone who has been nominated to fill a vacant PAS office from performing the duties of that office in an acting capacity, regardless of whether the acting officer was appointed under subsection (a)(1), (a)(2), or (a)(3). It is not limited to first assistants who automatically assume acting duties under (a)(1).

B

The Board contends that legislative history, purpose, and post-enactment practice uniformly show that subsection (b)(1) applies only to first assistants. The text is clear, so we need not consider this extra-textual evidence. See *State Farm Fire & Casualty Co.* v. *United States ex rel. Rigsby*, 580 U. S. ___ (2016) (slip op., at 9). In any event, the Board's evidence is not compelling.

The Board argues that subsection (b)(1) was designed to serve a specific purpose: preventing the President from having his nominee serve as an acting officer by making him first assistant after (or right before) a vacancy arises. Brief for Petitioner 38. The original draft of the FVRA authorized first assistants and PAS officers to perform acting service. Subsection (b) of that draft provided that if a first assistant was nominated to fill the vacant office, he could not perform that office's duties in an acting capacity unless he had been the first assistant for at least 180 days before the vacancy. Several Senators thought the FVRA too restrictive. They asked to add senior agency officials to the list of potential acting officers and to shorten the 180-day length-of-service requirement in subsection (b). Their requests, the Board says, were granted; the final version of the FVRA included subsection (a)(3) for senior employees and shortened the length-of-service requirement to 90 days. There was no intent to extend the prohibition in subsection (b) beyond first assistants. *Id.,* at 45–46.

The glitch in this argument is of course the text of subsection (b)(1). Congress did amend the statute to allow senior employees to become acting officers under subsection (a)(3). The only substantive change that was requested in (b) was to reduce the length-of-service requirement. Congress could have done that with a few tweaks to the original version of subsection (b). Instead, Congress went further: It also removed language that expressly limited subsection (b) to first assistants. And it added a provision—subsection (b)(2)—that makes sense only if (b)(1) applies to all acting officers. In short, Congress took a provision that explicitly applied only to first assistants and turned it into one that applies to all acting officers.

The Board protests that Congress would not have expanded the prohibition on nominees serving as acting officers after Senators asked to give the President *more*

flexibility. See Brief for Petitioner 45–46. That certain Senators made specific demands, however, does not mean that they got exactly what they wanted. Passing a law often requires compromise, where even the most firm public demands bend to competing interests. See *Ragsdale* v. *Wolverine World Wide, Inc.*, 535 U. S. 81, 93–94 (2002). What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators. See *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

Compromise is precisely what happened here: "[A] period of intense negotiations" took place after Senators demanded changes to the original draft of the FVRA, and the final bill was "a compromise measure." Rosenberg 9. The legislation as passed *did* expand the pool of individuals the President could appoint as acting officers, by adding senior employees in subsection (a)(3). But it also expanded the scope of the limitation on acting service in (b)(1), by dropping the language making (b)(1) applicable only to first assistants.

The Board contends that this compromise must not have happened because Senator Thompson, one of the sponsors of the FVRA, said that subsection (b)(1) "applies only when the acting officer is the first assistant, and not when the acting officer is designated by the President pursuant to §§3345(a)(2) or 3345(a)(3)." 144 Cong. Rec. 27496 (1998). But Senator Byrd—the very next speaker—offered a contradictory account: A nominee may not "serve as an acting officer" if "he is not the first assistant" or "has been the first assistant for less than 90 . . . days, and has not been confirmed for the position." *Id.,* at 27498. This is a good example of why floor statements by individual legislators rank among the least illuminating forms of legislative history. See *Milner* v. *Department of Navy*, 562 U. S.

562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language.").

Finally, the Board supports its interpretation with post-enactment practice. It notes that the Office of Legal Counsel and the Government Accountability Office have issued guidance construing subsection (b)(1) to apply only to first assistants. And three Presidents have, without congressional objection, submitted the nominations of 112 individuals who were serving as acting officers under subsections (a)(2) and (a)(3). The Board contends that this "historical practice" is entitled to "significant weight" because the FVRA "concern[s] the allocation of power between two elected branches of Government." Brief for Petitioner 49 (quoting *NLRB* v. *Noel Canning*, 573 U. S. \_\_\_, \_\_\_–\_\_\_ (2014) (slip op., at 6–7); internal quotation marks omitted).

"[H]istorical practice" is too grand a title for the Board's evidence. The FVRA was not enacted until 1998, and the 112 nominations that the Board cites make up less than two percent of the thousands of nominations to positions in executive agencies that the Senate has considered in the years since its passage. Even the guidance documents the Board cites paid the matter little attention; both made conclusory statements about subsection (b)(1), with no analysis.

In this context, Congress's failure to speak up does not fairly imply that it has acquiesced in the Board's interpretation. See *Zuber* v. *Allen*, 396 U. S. 168, 185, n. 21 (1969); *Alexander* v. *Sandoval*, 532 U. S. 275, 292 (2001). The Senate may not have noticed that certain nominees were serving as acting officers in violation of the FVRA, or it may have chosen not to reject a qualified candidate just to make a point about compliance with the statute. Either

is at least as plausible as the theory that the Legislature's inaction reflects considered acceptance of the Executive's practice.

Our decision in *Noel Canning*—the chief opinion on which the Board relies—is a sharp contrast. That case dealt with the President's constitutional authority under the Recess Appointments Clause, an issue that has attracted intense attention and written analysis from Presidents, Attorneys General, and the Senate. 573 U. S., at ___–___ (slip op., at 22–32). The voluminous historical record dated back to "the beginning of the Republic," and included "thousands of intra-session recess appointments." *Id.,* at ___, ___ (slip op., at 8, 12). That the chronicle of the Recess Appointments Clause weighed heavily in *Noel Canning* offers no support to the Board here.

## III

Applying the FVRA to this case is straightforward. Solomon was appointed as acting general counsel under subsection (a)(3). Once the President submitted his nomination to fill that position in a permanent capacity, subsection (b)(1) prohibited him from continuing his acting service. This does not mean that the duties of general counsel to the NLRB needed to go unperformed; the President could have appointed another person to serve as the acting officer in Solomon's place. And he had a wide array of individuals to choose from: any one of the approximately 250 senior NLRB employees or the hundreds of individuals in PAS positions throughout the Government. The President, however, did not do so, and Solomon's continued service violated the FVRA. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

## APPENDIX

Section 3345 of the FVRA provides:

"(a) If an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office—

(1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346;

(2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346; or

(3) notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity, subject to the time limitations of section 3346, if—

(A) during the 365-day period preceding the date of death, resignation, or beginning of inability to serve of the applicable officer, the officer or employee served in a position in such agency for not less than 90 days; and

(B) the rate of pay for the position described under subparagraph (A) is equal to or greater than the minimum rate of pay payable for a position at GS–15 of the General Schedule.

(b)(1) Notwithstanding subsection (a)(1), a person may not serve as an acting officer for an office under this section, if—

(A) during the 365-day period preceding the date of the death, resignation, or beginning of inability to serve, such person—

(i) did not serve in the position of first assistant to the office of such officer; or

(ii) served in the position of first assistant to the office of such officer for less than 90 days; and

(B) the President submits a nomination of such person to the Senate for appointment to such office.

(2) Paragraph (1) shall not apply to any person if—

(A) such person is serving as the first assistant to the office of an officer described under subsection (a);

(B) the office of such first assistant is an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate; and

(C) the Senate has approved the appointment of such person to such office.

(c)(1) Notwithstanding subsection (a)(1), the President (and only the President) may direct an officer who is nominated by the President for reappointment for an office in an Executive department without a break in service, to continue to serve in that office subject to the time limitations in section 3346, until such time as the Senate has acted to confirm or reject the nomination, notwithstanding adjournment sine die.

(2) For purposes of this section and sections 3346, 3347, 3348, 3349, 3349a, and 3349d, the expiration of a term of office is an inability to perform the functions and duties of such office."

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1251

_____

## NATIONAL LABOR RELATIONS BOARD, PETITIONER *v.* SW GENERAL, INC., DBA SOUTHWEST AMBULANCE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 21, 2017]

JUSTICE THOMAS, concurring.

I join the opinion of the Court because it correctly interprets the Federal Vacancies Reform Act of 1998 (FVRA), 5 U. S. C. §3345 *et seq.* The dissent's conclusion that the FVRA authorized the appointment in this case, however, implicates an important constitutional question that the Court's interpretation does not: Whether directing Lafe Solomon to serve as acting general counsel of the National Labor Relations Board (NLRB or Board), without the advice and consent of the Senate, complied with the Constitution. I write separately to explain my view that the Appointments Clause likely prohibited Solomon's appointment.

I

The Appointments Clause prescribes the exclusive process by which the President may appoint "officers of the United States." *United States* v. *Germaine*, 99 U. S. 508, 510 (1879); accord, *Buckley* v. *Valeo*, 424 U. S. 1, 132 (1976) (*per curiam*) ("[*A*]*ll* officers of the United States are to be appointed in accordance with the Clause . . . . No class or type of officer is excluded because of its special functions"). It provides that the President

"shall nominate, and by and with the Advice and Con-

sent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U. S. Const., Art. II, §2, cl. 2.

"[F]or purposes of appointment," the Clause divides all officers into two classes—"inferior officers" and noninferior officers, which we have long denominated "principal" officers. *Germaine*, *supra*, at 509, 511. Principal officers must be appointed by the President by and with the advice and consent of the Senate. See *Edmond* v. *United States*, 520 U. S. 651, 660 (1997). That process "is also the default manner of appointment for inferior officers." *Ibid.* But the Clause provides a limited exception for the appointment of inferior officers: Congress may "by Law" authorize the President, the head of an executive department, or a court of law to appoint inferior officers without the advice and consent of the Senate. *Ibid.*

The FVRA governs the process by which the President may temporarily fill a vacancy in an Executive Branch office normally occupied by an officer of the United States. As relevant in this case, when a vacancy arises, the President may "direct" an official to "perform the functions and duties of the office temporarily." 5 U. S. C. §§3345(a)(2), (3). That official may be an officer previously appointed by the President and confirmed by the Senate to any office, or certain high-ranking employees of the agency in which the vacancy arose. *Ibid.* The FVRA does not, however, require the President to seek the advice and consent of the Senate before directing the official to perform the functions of the vacant office.

When the President "direct[s]" someone to serve as an officer pursuant to the FVRA, he is "appoint[ing]" that person as an "officer of the United States" within the meaning of the Appointments Clause.  Around the time of the framing, the verb "appoint" meant "[t]o establish anything by decree," 1 S. Johnson, A Dictionary of the English Language (def. 3) (6th ed. 1785); T. Sheridan, A Complete Dictionary of the English Language (To Appoint) (6th ed. 1796), or "[t]o allot, assign, or designate," 1 N. Webster, An American Dictionary of the English Language (def. 3) (1828).  When the President "direct[s]" a person to serve as an acting officer, he is "assign[ing]" or "designat[ing]" that person to serve as an officer.

The FVRA authorizes the President to appoint both inferior and principal officers without first obtaining the advice and consent of the Senate.  Appointing inferior officers in this manner raises no constitutional problems.  That is because the Appointments Clause authorizes Congress to enact "Law[s]," like the FVRA, "vest[ing] the Appointment of such inferior Officers . . . in the President alone."  Appointing principal officers under the FVRA, however, raises grave constitutional concerns because the Appointments Clause forbids the President to appoint principal officers without the advice and consent of the Senate.

## II

Because we interpret the FVRA to forbid Solomon's appointment in this case, we need not confront these concerns.  But the dissent's contrary interpretation necessarily raises the question whether that appointment complied with the requirements of the Appointments Clause.  That inquiry turns on two considerations: (1) whether the general counsel of the NLRB is an "Officer of the United States" within the meaning of the Appointments Clause and, if so, (2) whether he is a principal officer who can be

appointed only by and with the advice and consent of the Senate.[1]  In my view, the general counsel plainly is an officer of the United States.  I also think he is likely a principal officer.

### A

As an initial matter, the NLRB's general counsel is an "officer of the United States" whose appointment is governed by the Appointments Clause.  "Extensive evidence suggests" that, at the time of the framing, this phrase was understood to encompass "all federal officials with responsibility for an ongoing statutory duty."  Mascott, Who are "Officers of the United States"? 70 Stan. L. Rev. (forthcoming 2017) (manuscript, at 74, online at https://ssrn.com/abstract=2918952 (as last visited Mar. 17, 2017)); see also Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O. L. C. 73, 77 (2007) (an officer of the United States was originally understood to be an official who "hold[s] a position with delegated sovereign authority" and whose office was "'continuing,'" rather than "'incidental'" or "ad hoc").  And this Court has previously held that an "Officer of the United States" is "any appointee exercising significant authority pursuant to the laws of the United States." *Buckley*, 424 U. S., at 126; see also *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 539– 540 (2010) (BREYER, J., dissenting) (collecting cases addressing who counts as an officer).

---

[1] That Solomon was appointed "temporarily" to serve as *acting* general counsel does not change the analysis.  I do not think the structural protections of the Appointments Clause can be avoided based on such trivial distinctions.  Solomon served for more than three years in an office limited by statute to a 4-year term, and he exercised all of the statutory duties of that office.  29 U. S. C. §153(d).  There was thus nothing "special and temporary" about Solomon's appointment. *United States* v. *Eaton*, 169 U. S. 331, 343 (1898).

The general counsel is an officer of the United States under both the probable original meaning of the Clause and this Court's precedents. He is charged by statute with carrying out significant duties. He "exercise[s] general supervision over all attorneys employed by the Board . . . and over the officers and employees in the regional offices." 29 U. S. C. §153(d). He has "final authority, on behalf of the Board, in respect of the investigation of charges and issuances of complaints . . . and in respect of the prosecution of such complaints before the Board." *Ibid.* The general counsel is effectively the Nation's labor-law prosecutor and is therefore an officer of the United States. See *Edmond*, 520 U. S., at 666 (treating the general counsel of the Department of Transportation as an officer).

## B

Although a closer question, the general counsel also is likely a principal officer. In *Edmond*, we explained that an "'inferior'" officer is one "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.*, at 663. That view is consistent with the original meaning of the term and with the practices of the early Congresses. See *id.*, at 663–664; *Morrison* v. *Olson*, 487 U. S. 654, 719–721 (1988) (Scalia, J., dissenting); see also, *e.g.,* Sheridan, *supra,* (Inferiour); 1 Johnson, *supra,* (Inferiour (def. 2)); 1 Webster, *supra,* (Inferior).[2] By con-

---

[2] In *Morrison*, the Court used a multifactor test to determine whether an independent counsel under the Ethics in Government Act of 1978, 28 U. S. C. §§49, 591 (1982 ed., Supp. V), was an "Inferior officer." 487 U. S., at 671–672. Although we did not explicitly overrule *Morrison* in *Edmond*, it is difficult to see how *Morrison*'s nebulous approach survived our opinion in *Edmond*. *Edmond* is also consistent with the Constitution's original meaning and therefore should guide our view of the principal-inferior distinction. See Calabresi & Lawson, The Unitary Executive, Jurisdiction Stripping, and the *Hamdan* Opinions: A Textualist Response to Justice Scalia, 107 Colum. L. Rev. 1002, 1018–

trast, a principal officer is one who has no superior other than the President.

The general counsel of the NLRB appears to satisfy that definition. Before 1947, the Board "controlled not only the filing of complaints, but their prosecution and adjudication" as well. *NLRB* v. *Food & Commercial Workers*, 484 U. S. 112, 117 (1987). The Labor Management Relations Act, 1947, ch. 120, 61 Stat. 136, however, "effected an important change" in the NLRB's structure by "separat[ing] the prosecuting from the adjudicating function, to place the former in the General Counsel, and to make him an independent official appointed by the President." *Lewis* v. *NLRB*, 357 U. S. 10, 16, n. 10 (1958). Congress thus separated the NLRB into "two independent branches," *Food & Commercial Workers*, 484 U. S., at 129, and made the general counsel "independent of the Board's supervision and review," *id.,* at 118; see also *id.,* at 129 (Congress "decided to place the General Counsel within the agency, but to make the office independent of the Board's authority"). Moreover, the general counsel's prosecutorial decisions are unreviewable by either the Board or the Judiciary. *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S. 132, 138 (1975); *Vaca* v. *Sipes*, 386 U. S. 171, 182 (1967).

Although the Board has power to define some of the general counsel's duties, see 29 U. S. C. §153(d), and the general counsel represents the Board in certain judicial proceedings, see Higgins, Labor Czars—Commissars—Keeping Women in the Kitchen—The Purpose and Effects of the Administrative Changes Made by Taft-Hartley, 47 Cath. U. L. Rev. 941, 967 (1998), the statute does not give the Board the power to remove him or otherwise generally to control his activities, see *Edmond, supra,* at 664 ("The power to remove officers, we have recognized, is a powerful tool for control"); see also *Free Enterprise Fund*, 561 U. S.,

--------

1019 (2007).

at 510 (holding that executive officials were inferior offic-
ers in large part because they were subject to a superior's
removal). Because it appears that the general counsel
answers to no officer inferior to the President, he is likely
a principal officer.[3] Accordingly, the President likely could
not lawfully have appointed Solomon to serve in that
role without first obtaining the advice and consent of the
Senate.

## III

I recognize that the "burdens on governmental processes"
that the Appointments Clause imposes may "often seem
clumsy, inefficient, even unworkable." *INS* v. *Chadha*,
462 U. S. 919, 959 (1983). Granting the President unilat-
eral power to fill vacancies in high offices might contribute
to more efficient Government. But the Appointments
Clause is not an empty formality. Although the
Framers recognized the potential value of leaving the
selection of officers to "one man of discernment" rather
than to a fractious, multimember body, see The Federalist
No. 76, p. 510 (J. Cooke ed., 1961), they also recognized
the serious risk for abuse and corruption posed by permit-
ting one person to fill every office in the Government, see
*id.,* at 513; 3 J. Story, Commentaries on the Constitution
of the United States §1524, p. 376 (1833). The Framers
"had lived under a form of government that permitted
arbitrary governmental acts to go unchecked," *Chadha*,
*supra*, at 959, and they knew that liberty could be pre-
served only by ensuring that the powers of Government
would never be consolidated in one body, see The Federal-
ist No. 51, p. 348. They thus empowered the Senate to
confirm principal officers on the view that "the necessity of
its co-operation in the business of appointments will be a

-----

[3] I think the general counsel would likely qualify as a principal officer
even under *Morrison* v. *Olson*, 487 U. S. 654 (1988). See *id.*, at 671–
672.

considerable and salutary restraint upon the conduct of" the President. The Federalist No. 76, at 514; 3 Story, *supra*, §1525, at 376–377. We cannot cast aside the separation of powers and the Appointments Clause's important check on executive power for the sake of administrative convenience or efficiency. See *Bowsher* v. *Synar*, 478 U. S. 714, 736 (1986).

That the Senate voluntarily relinquished its advice-and-consent power in the FVRA does not make this end-run around the Appointments Clause constitutional. The Clause, like all of the Constitution's structural provisions, "is designed first and foremost not to look after the interests of the respective branches, but to protect individual liberty." *NLRB* v. *Noel Canning*, 573 U. S. ___, ___ (2014) (Scalia, J., concurring in judgment) (slip op., at 3) (internal quotation marks and bracket omitted). It is therefore irrelevant that "the encroached-upon branch approves the encroachment." *Free Enterprise Fund*, *supra*, at 497 (internal quotation marks omitted). "Neither Congress nor the Executive can agree to waive" the structural provisions of the Constitution any more than they could agree to disregard an enumerated right. *Freytag* v. *Commissioner*, 501 U. S. 868, 880 (1991). The Judicial Branch must be most vigilant in guarding the separation between the political powers precisely when those powers collude to avoid the structural constraints of our Constitution.

\*    \*    \*

Courts inevitably will be called upon to determine whether the Constitution permits the appointment of principal officers pursuant to the FVRA without Senate confirmation. But here, the proper interpretation of the FVRA bars the appointment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1251

_____

## NATIONAL LABOR RELATIONS BOARD, PETITIONER *v.* SW GENERAL, INC., DBA SOUTHWEST AMBULANCE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 21, 2017]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, dissenting.

Many high-level offices in the Executive Branch may be filled only by a person who has been nominated to the position by the President and confirmed by the Senate. The Federal Vacancies Reform Act of 1998 (FVRA) cedes the Senate's confirmation authority, partially and on a temporary basis, to allow executive agencies to continue to function when one of those high-level offices becomes vacant. It authorizes certain categories of officials to perform the duties of vacant offices on an acting basis. One of its provisions pulls back that authorization when an official has been nominated to fill the vacant office on a permanent basis. The scope of that provision is at issue here. I agree with the Court that the provision applies to first assistants to a vacant office who serve as acting officials automatically, by operation of the FVRA. I disagree with the Court's conclusion that the provision also applies to other officials who may serve as acting officials if the President directs them to serve in that capacity. The Court gives the provision a broader reach than the text can bear with no support from the history of, or practice under, the FVRA. I respectfully dissent.

## I

As the Court explains, the FVRA governs vacancies in offices held by persons "whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate." 5 U. S. C. §3345(a). These are known as "PAS" offices. When an official in a PAS office "dies, resigns, or is otherwise unable to perform the functions and duties of the office" the FVRA steps in. *Ibid.*; see also §3345(c)(2) (an "expiration of a term of office" makes an official unable "to perform the functions and duties" of the office).

Section 3345 of the FVRA authorizes four categories of officials to perform the duties of a vacant office. Subsection (a)(1) contains a default rule: The "first assistant to the office" automatically assumes the vacant office and performs "the functions and duties of the office temporarily in an acting capacity." §3345(a)(1). Subsections (a)(2), (a)(3), and (c)(1) authorize the President to override that default rule. The President may direct a person already confirmed by the Senate to a PAS office to serve as the acting officer. See §3345(a)(2). The President may direct certain senior officials in the same agency to serve as the acting officer. See §3345(a)(3). Or the President may direct a person whose Senate-confirmed term in the office has expired and who has been nominated to a subsequent term in that same office to serve as the acting officer until the Senate acts on the nomination. See §3345(c)(1).

Subsection (b)(1) takes away this authorization in a specific situation. It provides that, "[n]otwithstanding subsection (a)(1)"—the first assistant default rule—a person may not serve as an acting official while nominated to fill the office if the person was not the first assistant to the office for at least 90 of the 365 days preceding the vacancy. §3345(b)(1). The prohibition in subsection (b)(1) does not apply to a person serving as the Senate-confirmed first assistant to the vacant office. See §3345(b)(2).

## II

In my view, the text, purpose, and history of the FVRA make clear that the prohibition in subsection (b)(1) applies only to a first assistant who performs the duties of a vacant office under subsection (a)(1).

## A

As the Court observes, subsection (b)(1) contains some potentially broad language. The provision specifies when "a person may not serve as an acting officer for an office under this section"—that is, §3345. The words "person" and "this section," taken in isolation, could signal that the prohibition applies to subsections (a)(1), (a)(2), (a)(3), and (c)(1) and thus covers all acting officials. But context matters. And here, the context cabins those words and gives subsection (b)(1) a more limited reach.

The text of subsection (b)(1) contains a clear signal that its prohibition applies only to first assistants who automatically assume a vacant office under subsection (a)(1): It begins with the clause "[n]otwithstanding subsection (a)(1)." A notwithstanding clause identifies a potential conflict between two or more provisions and specifies which provision will prevail. Under the familiar *expressio unius est exclusio alterius* interpretive canon, the choice to single out subsection (a)(1)—and only subsection (a)(1)—in this notwithstanding clause strongly suggests that the prohibition reaches, and conflicts with, subsection (a)(1), and only subsection (a)(1).

The rest of §3345 confirms this conclusion. The prohibition in subsection (b)(1) establishes who *may not* perform the duties of a vacant office. In doing so, it introduces a potential conflict with subsections (a)(1), (a)(2), (a)(3), and (c)(1), which identify four categories of persons who *may* perform the duties of a vacant office. By stating that its prohibition applies "[n]otwithstanding subsection (a)(1)," subsection (b)(1) expressly states that its prohibition takes

precedence over the default rule set out in subsection
(a)(1). The omission of any reference to subsections (a)(2),
(a)(3), and (c)(1), in spite of the parallel potential for con-
flict with those subsections, suggests that the omission
was a "'deliberate choice, not inadvertence.'" *Bruesewitz*
v. *Wyeth LLC*, 562 U. S. 223, 232–233 (2011) (quoting
*Barnhart* v. *Peabody Coal Co.*, 537 U. S. 149, 168 (2003)).
That choice means that subsection (b)(1) trumps subsec-
tion (a)(1) but not subsections (a)(2), (a)(3), and (c)(1).

Nothing about a notwithstanding clause renders it
impervious to this established rule of statutory interpreta-
tion. The Court says that the rule has less force in the
context of a notwithstanding clause because such a clause
"confirms rather than constrains" the breadth of the provi-
sion to which it is attached. *Ante,* at 11. But the breadth
of the attached provision is precisely the question here,
and the clause's specific reference to subsection (a)(1) and
only subsection (a)(1) strongly supports reading the at-
tached prohibition to limit only subsection (a)(1). See
*Preseault* v. *ICC*, 494 U. S. 1, 13–14 (1990) (a reference to
"'this Act'" in a notwithstanding clause limited the scope
of the attached provision (emphasis deleted)).

The Court claims that the reference to subsection (a)(1)
may serve a different purpose. In its view, the reference
might instead demonstrate a congressional concern that a
conflict between subsection (b)(1) and subsection (a)(1)
would be "quite likely to arise" or "particularly difficult to
resolve." *Ante,* at 11. A closer examination does not bear
out this hypothesis.

The text itself refutes the theory that subsection (b)(1) is
more likely to conflict with subsection (a)(1) than the other
subsections. The prohibition in subsection (b)(1) does not
apply to a person who served as the first assistant to the
vacant office for more than 90 days in the year before the
vacancy arose, §3345(b)(1)(A), or who serves as a Senate-
confirmed first assistant to the office, §3345(b)(2). A

person serving under subsection (a)(1)—by definition, only a first assistant—has a leg up in meeting those conditions and avoiding subsection (b)(1)'s prohibition altogether. Those serving under subsections (a)(2), (a)(3), and (c)(1)— PAS officials, senior agency officials, or officials whose terms in the vacant office have expired—do not. The prohibition in subsection (b)(1) is thus more likely, not less likely, to conflict with subsections (a)(2), (a)(3), and (c)(1).

And true enough, subsection (a)(1) sets out an automatic rule under which the first assistant assumes acting status upon a vacancy, whereas subsections (a)(2), (a)(3), and (c)(1) set out conditional rules, under which the President may choose to direct other officials to assume acting status. But that distinction makes no difference when asking whether a conflict between subsections (b)(1) and (a)(1) would be harder to resolve without guidance than a conflict between subsection (b)(1) and the other subsections. In stating who may not assume acting status, subsection (b)(1) conflicts equally with the rules about who may assume acting status set out in subsections (a)(1), (a)(2), (a)(3), and (c)(1). The reference to subsection (a)(1) in subsection (b)(1)'s notwithstanding clause thus cannot be understood as a means to resolve a particularly vexing conflict. The same conflict exists for all four categories.

Indeed, the Court's explanations make the notwithstanding clause in subsection (b)(1) superfluous. If the notwithstanding clause serves only to confirm the breadth of subsection (b)(1) and singles out subsection (a)(1) to address a conflict shared equally by other subsections, then it does no real work. The clause could be deleted without changing the meaning of subsection (b)(1), as the Court all but admits. See *ante,* at 12.

Worse still, a broad interpretation of subsection (b)(1) renders subsection (c)(1) superfluous. Under subsection (c)(1), the President may designate a person whose term in an office has expired and who has been nominated to a

subsequent term to serve as the acting official. It is un-
likely, even implausible, that a person who serves out a
set term will have served as the first assistant to her own
office during the year before her term expired. Yet subsec-
tion (b)(1) requires such service before a person can serve
as both an acting official and a nominee.[1] As a result, if
subsection (b)(1) applies to all acting officials, it would
prohibit what subsection (c)(1) expressly permits: acting
service by a person nominated by the President to serve
out a consecutive Senate-confirmed term in the vacant
office. That is no way to read a statute.

Not a problem, the Court says. "[S]ubsection (b)(1) has
no effect on (c)(1)" because subsection (c)(1) contains a
specific rule about acting service by a nominee for a second
term that, under ordinary principles of statutory interpre-
tation, controls over the general rule governing acting
service by a nominee in subsection (b)(1). *Ante*, at 14. The
Court's reasoning on this point undercuts its opening
claim that the words "person" and "under this section" in
subsection (b)(1) must refer to "anyone who performs
acting duties under the FVRA." *Ante*, at 9. And it under-
scores why the "[n]otwithstanding subsection (a)(1)" clause
in subsection (b)(1) is superfluous under the Court's read-
ing. The general authorization of acting service by a first
assistant in subsection (a)(1) would yield to the specific
prohibition on acting service by certain nominees in sub-
section (b)(1) even without the notwithstanding clause.[2]

––––––––––

[1] Subsection (b)(2)'s exception would not apply, as a person "nominated
. . . for reappointment for an additional term to the same office . . .
without a break in service," 5 U. S. C. §3345(c)(1), will of course not be
a Senate-confirmed first assistant to that office.

[2] SW General offers a different response that a person directed to
perform the duties of a vacant office under subsection (c)(1) does not
"serve as an acting officer," §3345(b)(1). See Tr. of Oral Arg. 30. This
also misses the mark. Like subsections (a)(1), (a)(2), and (a)(3), subsec-
tion (c)(1) is located in §3345, titled, "Acting officer." Div. C, §151(b),
112 Stat. 2681–611. Like those subsections, it addresses who may fill a

In contrast, reading subsection (b)(1) to apply only to a first assistant serving as an acting official under subsection (a)(1) renders no other provision superfluous. The Court reasons that subsection (b)(2)(A)'s reference to a person "serving as the first assistant to the office" would be superfluous if subsection (b)(1) applies only to first assistants serving under subsection (a)(1). See *ante*, at 13. But recall that subsection (b)(2) creates an exception to subsection (b)(1). Subsection (b)(1) provides that a person cannot serve as an acting official while nominated if that person was not the first assistant to the vacant office for at least 90 of the 365 days before the vacancy arose. Subsection (b)(2) states that those requirements do "not apply to" current Senate-confirmed first assistants. Put another way, subsection (b)(1) imposes requirements based on a person's past service, and subsection (b)(2) lifts those requirements based on a person's current service. The reference in subsection (b)(2)(A) to a person "serving as the first assistant to the office" is thus necessary to convey the relevant time period of the service that triggers the exception to subsection (b)(1).

## B

The events leading up to and following the enactment of the FVRA further support interpreting subsection (b)(1) to apply only to first assistants serving under subsection (a)(1).

––––––––––

vacant office. See 5 U. S. C. §3345(c)(2). And like those subsections, it expressly subjects service to the time limits in §3346, which apply to "the person serving as an acting officer as described under section 3345." §3346(a). Moreover, relegating officials directed to serve under subsection (c)(1) to some statutorily unnamed, non-acting official status would muddle other provisions of the FVRA. See §3347(a) (making §§3345 and 3346 "the exclusive means for temporarily authorizing an acting official" to serve in a PAS office); §3349(a)(2) (requiring reporting of "the name of any person serving in an acting capacity and the date such service began immediately upon the designation").

First, nothing in the legislative history of the FVRA indicates that subsection (b)(1) was enacted as a broad prohibition on acting service by all nominees. Under the Vacancies Act of 1868, the FVRA's predecessor, the first assistant to a vacant office served as the acting official unless the President directed another PAS official to do so. See Act of July 23, 1868, ch. 227, 15 Stat. 168–169. The Act did not prohibit any person, first assistant or otherwise, from serving as an acting official while nominated to fill the office. This structure remained in place for over a century.

The events that prompted the FVRA's enactment confirm, in line with the reading above, that the Act altered this pre-existing structure to prohibit certain first assistants from serving in an acting capacity while nominated to the vacant office. The service of one acting official, Bill Lann Lee, was the turning point in a broader, long-running dispute between the political branches over Executive Branch compliance with the Vacancies Act of 1868. In 1997, Lee was brought into the Department of Justice to serve as the Acting Assistant Attorney General for the Civil Rights Division after his nomination to the position failed. He continued to serve in an acting capacity after he was renominated to the position. The decision to bring Lee in to serve in the Department of Justice after his failed nomination led to strong congressional criticism. See, *e.g.,* Letter from A. Fois, Assistant Attorney General, Office of Legislative Affairs, to Sen. S. Thurmond, pp. 3–4 (Feb. 24, 1998). Subsection (b)(1) addresses the Lee incident and prevents its recurrence. See S. Rep. No. 105–250, p. 13 (1998) (explaining that an earlier version of subsection (b)(1) "prevent[s] manipulation of first assistants to include persons highly unlikely to be career officials"). It bars a first assistant from serving under subsection (a)(1) while nominated unless the person was the first assistant for a significant period of time before the vacancy

arose (90 of the previous 365 days) or the person is the Senate-confirmed first assistant to the vacant office.

In contrast, there is no indication of an intent to depart further from the century-old practice under the Vacancies Act of 1868 and prohibit acting service by other officials nominated to a vacant office. No one has identified congressional statements expressing concern with such service or calling for a broader prohibition. Indeed, an earlier version of subsection (b)(1) unquestionably applied only to first assistants serving under subsection (a)(1), even though the bill permitted the President to designate a PAS official as the acting official instead of the first assistant. See *id.*, at 25. The legislative history does not document the reason for the changes to this subsection. The Court suggests that an unspoken congressional compromise led to an expanded subsection (b)(1). *Ante,* at 15–16. While the compromise it hypothesizes is possible, no evidence supports it, and the absence of any hint that the compromise was hoped for during the development of or debate on the FVRA means that it is not probable.

Second, under the Court's reading of subsection (b)(1), the Executive Branch began violating the FVRA almost immediately after its enactment. Within months, the Department of Justice's Office of Legal Counsel (OLC) advised Executive Branch agencies that the prohibition in subsection (b)(1) "applies only to persons who serve as acting officers by virtue of having been the first assistant to the office." Guidance on Application of Federal Vacancies Reform Act of 1998, 23 Op. OLC 60, 64 (1999). The Government Accountability Office, tasked with aiding congressional enforcement of the FVRA, later reached the same conclusion. See Letter from C. Joyner, Dir., Strategic Issues, to F. Thompson, Chairman, U. S. Senate Committee on Governmental Affairs, Subject: Eligibility Criteria for Individuals To Temporarily Fill Vacant Positions Under the Federal Vacancies Reform Act of 1998, pp. 3–4

(GAO–01–468R, Feb. 23, 2001). Since the enactment of the FVRA, the Senate has received over 100 nominations of persons who continued to serve in an acting capacity after their nomination but had not satisfied the conditions in subsection (b)(1) for acting service by a nominee. See App. A to Brief for United States.

And yet, this legion of would-be violations prompted no response. No evidence suggests that the Senate reacted by requiring any of those nominees to cease their acting service. Cf. Pet. for Cert. 28–29 (citing objections raised after the decision below). The failure to object is all the more glaring in light of the enforcement mechanism written into the FVRA. Section 3349 requires each Executive Branch agency to "immediately" notify the Comptroller General, who heads the Government Accountability Office, and both Houses of Congress of "a vacancy . . . and the date such vacancy occurred," "the name of any person serving in an acting capacity and the date such service began," "the name of any person nominated to the Senate to fill the vacancy and the date such nomination is submitted," and the date a nomination is acted upon. This provision leaves no doubt that Congress had all the information it needed to object to any FVRA violations it perceived.

Congressional silence in the face of a decade-plus practice of giving subsection (b)(1) a narrow reach casts serious doubt on the broader interpretation. It indicates that Congress, like the Executive Branch, interpreted subsection (b)(1) in line with its text to reach only first assistants to the vacant office serving pursuant to subsection (a)(1).

\*    \*    \*

The FVRA prohibits a limited set of acting officials—non-Senate confirmed first assistants who serve under subsection (a)(1) and did not serve as the first assistant to the vacant office for at least 90 of the 365 days before the vacancy arose—from performing the duties of a vacant

SOTOMAYOR, J., dissenting

office while also serving as the President's nominee to fill that office.  Reading the provision more broadly to apply to all acting officials disregards the full text of the FVRA and finds no support in its purpose or history.  The Court prefers that reading.  I respectfully dissent.